CV 12 3197
NO SUMMONS ISSUED

SLR:LDM:TYH
F.#2010R01934

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

        Plaintiff,

- against-

TWO MILLION NINE HUNDRED
THOUSAND DOLLARS AND
NO CENTS IN UNITED STATES
CURRENCY ($2,900,000.00), AND
ALL PROCEEDS TRACEABLE THERETO,

        Defendant in rem.

- - - - - - - - - - - - - - - - -X

VERIFIED COMPLAINT IN REM

CV -

SPATT, J.

FILED
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y.
★  JUN 0 2012

      Plaintiff UNITED STATES OF AMERICA, by its attorney LORETTA E. LYNCH, United States Attorney for the Eastern District of New York, Tanya Y. Hill, Assistant United States Attorney, of counsel, for its complaint herein, alleges upon information and belief as follows:

### PRELIMINARY STATEMENT

      1.  This is a civil in rem action, brought pursuant to Title 18 U.S.C. § 981(a)(1)(C), to condemn and forfeit to the exclusive use and benefit of the United States of America two million, nine hundred thousand and no cents ($2,900,000.00) (the "Defendant Funds"), and all proceeds traceable thereto.

2. The Defendant Funds are subject to forfeiture to the United States insofar as they are identical to property found in the same place as property which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1952(a)(3) or a conspiracy to commit such offense, or are traceable to such violation or conspiracy.

## JURISDICTION AND VENUE

3. This court has jurisdiction over this action, pursuant to Title 28 U.S.C. §§ 1345 and 1355.

4. Venue in the Eastern District of New York is proper, pursuant to Title 28 U.S.C. §§ 1355 and 1395.

## STATUTORY BACKGROUND

5. Pursuant to Title 18, United States Code, Section 1952(a)(3), it is unlawful to travel in interstate or foreign commerce or use the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of any unlawful activity, and thereafter to perform and attempt to perform acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of such unlawful activity. Pursuant to Title 18, United States Code, Section 1952(b), "unlawful activity" includes extortion, bribery, or arson in violation of the laws of the State in which committed. Under New York Penal Law Sections

3

180.03, 180.08 and 20.00, commercial bribery is unlawful. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), property, real or personal, that is identical to property found in the same place as property which constitutes or is derived proceeds traceable to a violation of Title 18, United States Code, Section 1952(a)(3), or to a conspiracy to commit such offense, and any property traceable to any such property, is subject to civil forfeiture.

## FACTS

I. Background

6. At all times relevant to this verified complaint in rem, FalconStor Software, Inc. ("FalconStor") was a publicly held software company with its principal place of business in Melville, New York.

7. FalconStor's business involved the sale of electronic data protection and storage virtualization solutions. Its Virtual Tape Library ("VTL") product permitted its users to store large quantities of data in remote facilities without physically transferring drives, disks or tapes. The majority of FalconStor's customers were intermediary vendors that provided FalconStor's products to third-party end users. FalconStor also had direct relationships with some end users.

8. FalconStor's Code of Conduct contained a "gifts and entertainment" provision, which limited and regulated the

4

gifts that FalconStor employees were permitted to give or receive.

9. JPMorgan Chase & Co. was a financial holding company with its principal place of business in New York, New York. JPMorgan Chase Bank, National Association ("JPMC") was a national banking association and wholly-owned subsidiary of JPMorgan Chase & Co. JPMC's Global Technology Infrastructure ("GTI") division, located in Columbus, Ohio, was responsible for purchasing JPMC's electronic storage products.

10. JPMC's Code of Conduct prohibited employees from accepting certain gifts, including cash or cash equivalents of any amount, from any customer, supplier or other party doing business with JPMC.

11. Prior to March 2008, JPMC was an end user of FalconStor software through a third-party intermediary.

II. The Bribery Conspiracy

A. 2007 Bribes in China and the 2008 Contract

12. In October 2007, FalconStor sought to create a direct sales relationship between itself and JPMC. To that end, FalconStor's then-Chief Executive Officer (the "CEO"), dispatched a FalconStor salesperson (the "FalconStor Salesperson"), to Hong Kong to meet with, and offer bribes to, several JPMC technology executives who were visiting Hong Kong from Columbus, Ohio. Among the JPMC technology executives was "JPMC Executive #1."

5

13. The CEO arranged for $35,000 to be wired from FalconStor's bank accounts in Manhasset, New York, to a bank account in Taiwan. The CEO then directed a FalconStor employee in Taiwan to convert the $35,000 into travelers' checks and bring the travelers' checks to the FalconStor Salesperson in Hong Kong.

14. The FalconStor Salesperson then used the $35,000 to purchase travel tickets to Macau, China, gambling vouchers, meals and other gifts for the JPMC executives, including JPMC Executive #1, when they arrived there. A portion of the $35,000 was returned to the CEO upon the FalconStor Salesperson's return to Melville, New York.

15. On or about March 31, 2008, FalconStor entered into a contract with JPMC for the licensing of software in the amount of approximately $4.1 million and related services in the amount of approximately $888,000.

B. <u>2009 Bribes and Contract</u>

16. On or about March 8, 2009, the CEO worked with the FalconStor Salesperson, another FalconStor officer (the "FalconStor Officer"), and others to obtain and grant, as a bribe, 25,000 options to purchase FalconStor stock to the brother of JPMC Executive #1.

17. In connection with the March 8, 2009 grant of stock options to the brother of JPMC Executive #1, the CEO, the FalconStor Officer, the FalconStor Salesperson and others caused

the books and records of FalconStor to falsely reflect that the 25,000 stock options constituted proper compensation to an "advisor," when it actually was a bribe, and when JPMC Executive #1's brother had provided no advisory or other service to FalconStor.

18. At various times during 2009, the CEO and the FalconStor Officer also approved the expenditure of FalconStor funds to pay for golf memberships and other golf-related benefits at golf clubs in and around Columbus, Ohio, for JPMC Executive #1 and other JPMC employees.

19. During the spring of 2009, the CEO arranged for FalconStor to pay $40,000 to a FalconStor employee based in Columbus, Ohio, with the understanding that the employee would use the money to rent a house near Columbus owned by JPMC Executive #1. Later, when JPMC Executive #1 decided to sell his house, the CEO approved the use of the remainder of the $40,000 as a down payment toward the FalconStor employee's purchase of the house.

20. On or about May 15, 2009, the CEO arranged for a $240,000 payment to be made by FalconStor to the FalconStor Salesperson and directed the FalconStor Salesperson to travel to Las Vegas, Nevada, to deposit $100,000 of this payment, as a bribe, into a gambling account for the benefit of JPMC Executive #1.

21. In connection with the May 15, 2009 payment, the CEO and others caused the books and records of FalconStor to falsely reflect that the $240,000 payment was a bonus to the FalconStor Salesperson, when $100,000 of it was actually a bribe.

22. On or about June 26, 2009, FalconStor entered into a contract with JPMC for the licensing of software in the amount of approximately $5.9 million.

23. Between July 2009 and November 2009, the CEO and others arranged for approximately $50,000 in gift cards and other cash equivalent payments to be made to JPMC Executive #1 and other JPMC employees.

24. On or about November 17, 2009, FalconStor entered into a contract with JPMC for the licensing of software in the amount of approximately $1.3 million.

C.   2010 Bribes

25. In early 2010, JPMC executives met with the CEO and others and reported various technical difficulties with the storage software that JPMC had purchased from FalconStor.

26. In approximately March 2010, the CEO arranged for approximately $20,000 in cash to be withdrawn from FalconStor's bank accounts and to be paid as bribes to various JPMC employees, including JPMC Executive #1.

27. On or about April 6, 2010, the CEO arranged for 20,000 restricted FalconStor shares to be paid, as a bribe, to

8

JPMC Executive #1, by authorizing the deposit of the 20,000 restricted shares into an account in the name of JPMC Executive #1's brother.

28. In connection with the April 6, 2010 grant of restricted shares, the CEO and others caused the books and records of FalconStor to falsely reflect that the grant of 20,000 shares of restricted stock was proper compensation to an "advisor," when it actually was a bribe, and when JPMC Executive #1's brother had provided no advisory or other service to FalconStor.

29. Between January and September 2010, the CEO and FalconStor Officer also approved the expenditure of approximately $25,000 in additional gift cards and golf memberships for the benefit of JPMC employees.

30. Using the ways and means described above, FalconStor realized total proceeds of at least $3,750,000.00.

## CLAIM FOR RELIEF

31. Plaintiff repeats the allegations contained in paragraphs 1 through 30 as if fully set forth herein.

32. The Defendant Funds are identical to property found in the same place as property which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. 1952(a)(3).

33. As a result of the foregoing, the Defendant Funds are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C).

**WHEREFORE**, plaintiff requests that the Defendant Funds and all proceeds traceable thereto be forfeited and condemned to the use and benefit of the United States of America; and that the plaintiff be awarded its costs and disbursements in this action and such other and further relief as the Court deems proper and just.

Dated: Brooklyn, New York
       June 27, 2012

          LORETTA E. LYNCH
          UNITED STATES ATTORNEY
          Eastern District of New York
          271 Cadman Plaza East
          Brooklyn, NY 11201

BY: _____
    Tanya Y. Hill
    Assistant U.S. Attorney
    (718) 254-6144

**VERIFICATION**

1. I am a Special Agent with the Federal Bureau of Investigation.

2. I have read the Verified Complaint <u>in rem</u> in this action.

3. The matters contained in the within Verified Complaint <u>in rem</u> are true and accurate to the best of my knowledge, information and belief.

4. The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers and the official files and records of the United States Department of Justice.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Brooklyn, New York
       June 27, 2012

_____
THOMAS MCDONALD
Special Agent
Federal Bureau of Investigation